July 11, 1979

### 79-51   MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Constitutional Law—Article I, Section 6, Clause 2—Appointment of Member of Congress to a Civil Office

This responds to the informal request of the Senate Judiciary Committee for the opinion of the Department of Justice regarding an unsigned memorandum dated July 2, 1979, taking the position that Article I, Section 6, Clause 2, of the Constitution bars Representative Abner Mikva from appointment during the present Congress as a judge of the U.S. Court of Appeals for the District of Columbia Circuit. That position rests on untenable factual assumptions and on a constitutional analysis that, in our opinion, is at odds with the plain language and settled interpretation of Clause 2. The clause reads as follows:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

#### I.

The memorandum argues that wisdom dictates that Representative Mikva's appointment as a judge be deferred beyond the expiration of his current congressional term, which began in January 1979. Its core premise is that "existing law will operate to increase the compensation of circuit judges during Representative Mikva's present term of office." However, the premise—namely, that the compensation of Federal judges must in fact increase during the present Congress—is speculative.

Federal appellate judges are compensated at rates determined under

§ 225 of the Federal Salary Act of 1967, Pub. L. No. 90-206, 81 Stat. 643, as amended, 2 U.S.C. §§ 351-361, and adjusted pursuant to the Executive Salary Cost-of-Living Adjustment Act, Pub. L. No. 94-82, 89 Stat. 422, 28 U.S.C. § 461. Pursuant to § 205(a)(1) of the Executive Salary Cost-of-Living Act, the salary rate of Federal judges is to be adjusted by a percentage of the salary rate equal to the overall percentage of adjustments made in the rates of pay under the General Schedule. Adjustments in the rates of pay under the General Schedule are governed by the Federal Pay Comparability Act of 1970, Pub. L. No. 91-656, 84 Stat. 1946, 5 U.S.C. § 5305 *et seq.* It provides that the President is to direct his agent to prepare annually a report comparing rates of pay in the statutory pay system with rates of pay for the same levels of work in the private sector, and recommending appropriate adjustments of the former. After considering the report and the findings of the Advisory Committee on Federal Pay, the President is to adjust statutory rates of pay accordingly. That adjustment becomes effective in October of the applicable year. Alternatively, the President, in view of economic conditions affecting the general welfare, may prepare and transmit to Congress before September 1 of each year an alternative plan incorporating salary adjustments that he considers appropriate. Such an alternative also becomes effective in October, and it is to continue in effect unless, within a stated period, either House of Congress adopts a resolution disapproving the alternative plan. If a disapproval resolution is adopted, the salary adjustments for the statutory pay system recommended by the Advisory Committee on Federal Pay are to become effective.

A fundamental element of the foregoing statutory scheme is that salary adjustments are triggered by action of the President, which for 1979 has not yet occurred and will not necessarily occur under the statutory scheme until September. Moreover, once a Presidential decision is transmitted to Congress, it is possible that Congress will act to the contrary by legislation, as it has in the past, preventing upward salary adjustments. In short, it is incorrect to assert that, at the present time, it is known as a fact that the salary of Federal appellate judges will increase this year or, indeed, during this Congress.

## II.

Thus, the issue at this time is not whether Congressman Mikva may be appointed to a judgeship the emoluments of which have already been increased, but rather whether he may be appointed to a judgeship as to which the emoluments may be increased subsequent to his appointment. To hold that in the latter situation he is precluded from appointment, it would be necessary to construe Clause 2 as barring the appointment of a Member of the Congress to a civil office during the term for which he has been elected before the emoluments of the office have been increased. That interpretation is plainly at odds with the language of the

constitutional provision itself, stating that no Member of Congress "shall * * * be appointed" to a civil office the emoluments of which *"shall have been increased"* during the term for which the Member ·was elected. [Emphasis added.] By using the future tense in referring to an appointment, while employing the future perfect tense to refer to an increase in emoluments, the provision on its face plainly shows an intention of preventing an appointment only when an increase in the emoluments of an office precedes an appointment to that office.

The importance of carefully construing the literal language of the constitutional provision is underscored in the opinion of Attorney General Ramsey Clark, 42 Op. Att'y Gen. 381 (1969), which concluded that it did not disqualify Representative Laird from appointment as Secretary of Defense. The essential foundation of the Clark opinion was the language of the constitutional proscription, which, he held, "clearly does not apply to an increase in compensation which is proposed subsequent to the appointment." Furthermore, he held that it did not apply where "it is possible but not certain at the time of the appointment that a proposed salary increase for the appointee may receive final approval at a future date." 42 Op. Att'y Gen., at 382. The reasoning, which is directly applicable to the present case, is as follows:

> It is my view that, notwithstanding submission of any salary increase recommendations in the Budget message, the salaries in question will not 'have been increased' within the meaning of the constitutional prohibition so long as Congress may still exercise its power of disapproval. Assuming that you [Representative Laird] are, in the normal practice * * * nominated, confirmed, and appointed as Secretary of Defense within a few days following the inauguration, *i.e.,* during the period in which it remains uncertain whether Congress may disapprove the Presidential salary recommendations, I believe your appointment will not be precluded by this constitutional clause. [*Id.* at 382–83.]

Just as Attorney General Clark concluded that before an increase is certain an appointment is valid, so in the present circumstances, until such an increase has become an accomplished fact, Representative Mikva's appointment is permissible.

The memorandum attempts to distinguish the Clark opinion on the ground that the salary statute in effect at that time is different from the present salary statute because under the current arrangement, some salary adjustment will go into effect unless the Congress as a whole, as opposed to one House alone, takes affirmative legislative action to prevent it. The notion is that present law makes it somewhat more difficult for Congress to prevent a salary increase. However, whatever else may be said about the distinction, it is simply not germane to the reasoning of the Clark opinion. The opinion, in summarizing the applicable statutory scheme, emphasized that "* * * it will be uncertain whether there will be any increase in Cabinet salaries until March 1, or such earlier date as Congress may

take definitive action manifesting that it will not disapprove such increase." [Emphasis added.] 42 Op. Att'y Gen., at 382. The precise nature of "definitive action" by Congress was not an issue in the Clark situation. Rather, the crucial point was the uncertainty of a salary increase at the time of Mr. Laird's appointment. Furthermore, nothing in the language of the constitutional provision suggests that it operate only when it may be relatively less difficult for. Congress to prevent an increase. Rather, the critical point is whether there has been an "appointment of a legislator to an office the compensation of which *shall have been*' increased prior to the making of such appointment." [Emphasis in original.] 42 Op. Att'y Gen. at 381–82.

The memorandum also asserts that the present case is covered by the 1882 opinion of Attorney General Brewster, 17 Op. Att'y Gen. 365, holding that a former member of Congress could not be appointed to an office because of the proscription of Clause 2. However, the memorandum neglects to note that the situation underlying the Brewster opinion is fundamentally distinguishable from the present case. The Brewster opinion involved a former Senator, whose term was to expire in March 1883; he resigned from the Senate in 1881 to accept appointment as Secretary of the Interior, subsequently resigned from that position, returned to private life, and was being considered for appointment to the office of tariff commissioner created by legislation enacted on May 15, 1882. It is obvious that he could not have been appointed to the newly created position until after it had in fact been created. Thus, as Attorney General Clark stressed in his opinion in discussing the Brewster holding, it rested on a crucial distinguishable factual foundation, and as such it "has no bearing on [the present] situation." 42 Op. Att'y Gen. at 383.[1]

In short, the language and settled interpretation of Clause 2 establish that Representative Mikva is not barred from appointment.

## III.

It should be further noted that, contrary to the view expressed in the memorandum, even if a salary increase for Federal judges generally were to occur, Congress could, by legislation, exempt from coverage the office to which Representative Mikva may be appointed. Such action was taken in the past. In 1909 President Taft sought to appoint Senator Knox as Secretary of State, although in the prior year the compensation for that

---

[1] Moreover, it should be noted that if the opposite interpretation were followed, and it were held that a sitting Member of Congress could not be appointed to an office the emoluments of which were increased after his appointment, then Congress, by enacting a salary increase after the President had appointed him a Federal judge, would thereby retroactively invalidate the appointment. This would, in effect, amount to his removal and thus would circumvent the constitutionally mandated process of impeachment as the only existing method for removing Federal judges.

office had been increased. A bill was enacted reducing the salary of the office to the previous level in order to avoid the constitutional problem. *See* 43 CONGRESSIONAL RECORD 2205, 2390-2403. The same action was taken with respect to the appointment of Senator Saxbe to the office of Attorney General. *See* Pub. L. No. 93-178, 87 Stat. 697 (Dec. 10, 1973). Accordingly, even if a salary increase were to become effective prior to the appointment of Representative Mikva, which is not the situation presently existing, he would not thereby be necessarily barred from appointment.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*